**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **DERRICK NICHOLS, BABATUNDE OWOSENI, DANIEL SMITH, and AARON WATSON,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **CIVIL NO. 04-555-GPM** |
| **SOUTHERN ILLINOIS UNIVERSITY EDWARDSVILLE,** | ) | |
| **Defendant.** | ) | |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

Defendant Board of Trustees of Southern Illinois University governing Southern Illinois University Edwardsville ("the University") has filed a motion for summary judgment seeking to take the remaining claims in this racial discrimination suit from a jury.[1] According to the University, there are no triable issues of fact, and it is entitled to judgment as a matter of law. A hearing was held on April 17, 2006, and after carefully considering all of the pleadings and the arguments of counsel, the Court agrees with the University.

## BACKGROUND

The four plaintiffs in this action are current (Derrick Nichols and Aaron Watson) and former (Babatunde Owoseni and Daniel Smith) University police officers. They are African-American.

[1]The Court notes that claims brought under Sections 1981 and 1983 were dismissed with prejudice pursuant to a stipulation filed on May 10, 2005 (*see* Doc. 24).

Owoseni and Smith were discharged in September 2003 by the State Universities Civil Service Merit Board ("the Merit Board") following an evidentiary hearing. The hearing was held to address charges leveled by the University, including making false statements about the Chief of Police and other command staff, and insubordination. Nichols and Watson remain employed with the University.

Plaintiffs claim that the University has racially discriminated against them. Their claims can be broken down into three categories:

1. **Assignments:** Plaintiffs claim they were disproportionately assigned to the University's East St. Louis campus because of their race.

2. **Upgrades:** Plaintiffs claim that "upgrades" in job assignments were given to two white police officers, Royston and Delmore, instead of them, again because of their race (Plaintiff Watson does not join in this claim).

3. **Retaliation:** Plaintiffs claim they were retaliated against for making complaints of racial discrimination.

## DISCUSSION

A. Legal Standard

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In considering a summary judgment motion, a court must review the entire record and draw all reasonable inferences in the light most favorable to the non-moving party. *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981). On summary judgment a court may not make credibility determinations or weigh the evidence, because these are tasks for a factfinder. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1138 (7th Cir. 1994). In evaluating a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

"Title VII forbids certain employers 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of' his race." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004)(quoting 42 U.S.C. § 2000e-2(a)(1)). The anti-retaliation provision also forbids employers from taking an adverse employment action against an employee for opposing discrimination. 42 U.S.C. § 2000e-3(a).

B. Direct Evidence

Plaintiffs assert that they have direct evidence of intentional discrimination. First, they claim that the Chief of Police admitted that he assigned them to the East St. Louis campus because they are African-American. They also claim that statistics prove that they were disproportionately assigned to the East St. Louis campus.

Disparate treatment "is the most easily understood type of discrimination." *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). In such a case, "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Id.* "Disparate treatment" claims are different from claims that stress "disparate impact." The latter claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 335. Proof of discriminatory motive is critical in "disparate

treatment" cases; it is unnecessary in "disparate impact" cases. *Id.*

Plaintiffs' complaint pleads this case as one for disparate treatment. It alleges that the University "disproportionately assigned the black Officers to work the East St. Louis campus and the white Officers to work the Edwardsville campus, because of their race." (*See* Doc. 1, para. 17.) There is nothing in the complaint alleging facially neutral treatment that fell more harshly on African-Americans. Nichols, Owoseni, Smith, and Watson claim that they were assigned to work at the East St. Louis campus because of their race. This is a claim for disparate treatment, and Plaintiffs must prove a discriminatory motive. Stated differently, each plaintiff must prove that he was intentionally discriminated against by being treated differently because of the color of his skin. The statistics relied upon do not prove anything with respect to each individual claim of discrimination. There is no direct evidence in the record that *Chief Harrison*, the decisionmaker, assigned anyone to the East St. Louis campus based on his race.

Plaintiffs rely on Dan Smith's affidavit which attests that Chief Harrison said "that the administration at East St. Louis wanted to see more 'black faces' among the police force [at the East St. Louis campus]." (*See* Exhibit 3 to Doc. 53.) The University does not dispute that requests were made by administrators for more black officers at both campuses. But Plaintiffs have no evidence that Chief Harrison, the person making the assignment decisions, based his decision on race. Requests by non-decisionmakers do not constitute direct evidence of intentional race discrimination.

C. <u>Indirect Evidence</u>

1. Assignments

To establish a prima facie case of race discrimination, a plaintiff proceeding under the indirect method of proof must prove four elements: (1) he was a member of a protected class; (2) he

was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly-situated individual outside of his protected class more favorably. *See Little*, 369 F.3d at 1011.

There is no question that Nichols, Owoseni, Smith, and Watson are members of a protected class: they are African-American. There also does not appear to be an issue whether they were performing their jobs satisfactorily, at least as it relates to their campus assignments. The more troublesome issue is whether an assignment to a particular work site, in this case the East St. Louis campus of the University, amounts to an "adverse employment action," and whether Plaintiffs can show that the University treated a similarly-situated Caucasian more favorably.

In *O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir. 2004), the Seventh Circuit affirmed summary judgment for the defendant in a case where an African-American female police sergeant was transferred from the position of administrative sergeant to beat sergeant. Similar to the instant case, both jobs involved the same rank, pay, and benefits. Noting that "[b]y definition, any lateral job transfer will result in changes to an employee's job responsibilities and work conditions," the Seventh Circuit concluded that the plaintiff had failed to establish that the transfer was an adverse employment action. In *O'Neal*, the plaintiff's complaints "about the transfer reveal[ed] only a 'purely subjective preference for one position over another,' which [did] not 'justify trundling out the heavy artillery of federal antidiscrimination law.'" *Id.* at 913 (quoting *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 745 (7th Cir. 2002)).

It is hard for the Court to see how Smith and Watson can argue that the assignment to the East St. Louis campus was an adverse employment action when the undisputed evidence is that they *requested* the assignment. Officer Smith requested the assignment in September 2001 in a

memorandum written to Captain Hayes. He wanted to work at the East St. Louis campus as a student resource officer (SRO) for at least two semesters (almost an entire year). (*See* Deposition of Daniel Smith, attached to Doc. 46, at p. 30.)

Similarly, Officer Watson wanted to work as an SRO at the East St. Louis campus as part of an internship to complete his bachelor's degree, and he requested his one and only assignment to that campus. (*See* Deposition of Aaron Watson, attached to Doc. 46, at p. 32.) Watson also indicated on other occasions that he would be willing to work at the East St. Louis campus, and he had no preference amongst the campuses. (*Id.* at p. 44, 47-48.) Whether it was a coveted or a loathed assignment, "the fact that [a plaintiff] had continually requested such a move renders [his] claim that it was an adverse employment action meritless." *Krause v. City of LaCrosse*, 246 F.3d 995, 1001 (7th Cir. 2001). As the Seventh Circuit stated in *Krause*, "employers are entitled to assume that if an employee requests to be transferred to another area of the office, then [he] actually wants the transfer." *Id*.

While it is not necessary to continue, at least as to the claims of Smith and Watson, the Court notes that Plaintiffs attempt to create an issue of fact with evidence that the East St. Louis campus assignment was viewed as an undesirable one. But an employee's own subjective belief about the undesirability of an assignment is not enough to establish an adverse employment action. "[A] plaintiff's perception that a lateral transfer would be personally humiliating is insufficient, absent other evidence, to establish a materially adverse employment action." *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 457 (7th Cir. 1994) (citing *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883, 885-86 (7th Cir. 1989)). There is no evidence in the record that any management employee or decisionmaker considered the East St. Louis assignment to be unattractive or punishing. In fact,

white officers also requested assignment to East St. Louis on occasion, and it appears that the assignment was simply one of personal preference.

Relying on a district court case, Plaintiffs argue that it is not necessary for them to prove they suffered an adverse employment action because Title VII makes it unlawful for an employer to "limit, segregate or classify" its employees on the basis of race. *See* 42 U.S.C. § 2000e2(a)(2); *Moranski v. General Motors Corp.*, No. 1-04-CV-0650-DFH-TAB, 2005 WL 552419 (S.D. Ind. Feb. 24, 2005), *aff'd*, 433 F.3d 537 (7th Cir. 2005). In *Moranski*, the district court granted summary judgment to General Motors in a case where the plaintiff complained of religious discrimination because General Motors would not allow him to organize an "affinity group" for Christians, even though the company supported such groups for other non-religious social organizations. Holding that the plaintiff could never prove religious discrimination because General Motors forbade such groups for *all* religions, not just Christians, the district court noted that "[t]he central question in any employment-discrimination case is whether the employer would have taken the same action had the employee had been a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Moranski v. General Motors Corp.*, No 1-04-CV-0650-DFH-TAB, 2005 WL 552419, at *4 (S.D. Ind. Feb. 24, 2005) (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158 (7th Cir. 1996)). The district court speculated that proof of an adverse employment action might not be required in cases of direct and explicit discrimination:

> For example, the court assumes that GM might violate Title VII if it authorized an Affinity Group for Christians but refused to authorize one for Jewish or Muslim employees, just as it would violate Title VII if it required black and white employees to eat in separate but equal lunch rooms.

*Id.*

The Court fails to see how this advances Plaintiffs' position. If the University maintained racially segregated work areas, restrooms, cafeterias, and drinking fountains as Plaintiffs hypothesize, it would certainly violate Title VII because such segregation would be based on race. In the instant case, there is no evidence that the decision to assign Plaintiffs to the East St. Louis campus would have been different if they had been white and everything else had remained the same.

Finally, Plaintiffs argue that the lateral transfer to the East St. Louis campus was accompanied by "significantly diminished material responsibilities" and/or a "dramatic downward shift in skill level required to perform job responsibilities." This case is not like *Tart v. Illinois Power Co.*, 366 F.3d 461 (7th Cir. 2004), however, where an employee's alleged lateral transfer put him "outdoors in the winter digging ditches under the command of a man he had previously trained." *Id.* at 468.

First, as the University points out, the East St. Louis assignment was just that – a rotating, semester-long assignment, not a permanent transfer. In *Herrnreite*r, the Seventh Circuit discussed three scenarios which constitute action sufficient to violate Title VII:

> 1. Cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including, of course, as the limiting case, termination of employment;
>
> 2. Cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted . . . . A variant . . . is where the employee's job is changed in a way that injures his career . . . except that there is no transfer;
>
> 3. Cases in which the employee is not moved to a different job

> or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment – an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet.

*Herrnreiter*, 315 F.3d at 744 (citations omitted, emphasis in original).

There is no evidence that the temporary assignment to the East St. Louis campus inhibited Plaintiffs' professional growth or diminished their opportunities for advancement. At most, Plaintiffs argue that the East St. Louis assignment was less interesting because the campus was smaller, and they speculate that police officers would rather be at the larger Edwardsville campus. This is insufficient under Seventh Circuit jurisprudence to establish that a temporary assignment to the East St. Louis campus was an adverse employment action.

Finally, Plaintiffs have not identified any similarly-situated white police officers who were treated more favorably. In fact, the University has produced evidence that there were many white officers assigned to the East St. Louis campus as much and sometimes even more than Nichols, Owoseni, Smith, and Watson. The fourth prong of the prima facie case likewise fails, and the University is entitled to summary judgment on this claim.

2. Upgrades

A brief discussion of what is an upgrade is in order. An upgrade is a temporary job change to fill a vacancy on an as-needed basis. An upgrade differs from a promotion, which is defined by the University as a permanent appointment to a different position. Upgrade decisions are made by police department management; promotions are governed by the Civil Service Act and the Collective Bargaining Agreement ("CBA"). Each plaintiff herein was eligible from time to time

for temporary upgrades to sergeant, and each periodically received such upgrades. None of them ever passed all portions of the qualifying examination for a permanent promotion to sergeant. (*See* Affidavit of Darron Cannon, Ex. A to Doc. 46.)

Nichols, Owoseni, and Smith claim that the University discriminated against them when it gave two white police officers, Delmore and Royston, upgrades to sergeant in October and November of 2002. To establish a prima facie case of race discrimination with respect to these upgrades, Plaintiffs must show that (1) they belong to a protected group; (2) they applied and were qualified for a position for which the University was seeking applicants; (3) they were rejected despite their qualifications; and (4) the position was given to someone of a different race who had similar or lesser qualifications. *See Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000). Here the problem lies with the second and fourth prongs.

"If a plaintiff does not apply for a job vacancy that is posted, he cannot make a prima facie case for unlawful discrimination or retaliation under Title VII unless the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Nichols, Owoseni, and Smith have offered no evidence that they sought the upgrades that they now complain about not receiving. Plaintiffs have not even produced competent evidence that they would have applied for the position if they had known about it, and that they would have accepted the position too.

Also fatal to their claim is the lack of evidence showing that Nichols, Owoseni, and Smith had qualifications which exceeded those of the officers who received the upgrades, Delmore and Royston. There is little evidence before the Court concerning the qualifications; the University

points out that Plaintiffs had no idea during their depositions what Delmore and Royston's qualifications were at the time they were chosen for the upgrades. Plaintiffs simply speculate that they are better qualified.

Plaintiffs have failed to make a prima facie case of discrimination with respect to the upgrades. The University is entitled to summary judgment on these claims.

3. Retaliation

Similarly, to prevail on a claim of retaliation, a plaintiff must show "that the employer subjected him, and not any similarly situated employee who did not oppose impermissible discrimination, to an adverse employment action even though he was performing his job satisfactorily." *Little*, 369 F.3d at 1011 (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003)). Thus, what each plaintiff must prove for a claim of retaliation is only slightly different from what he must prove for a claim of discrimination: (1) he engaged in statutorily protected activity; (2) he performed his job according to the employer's expectations; (3) he suffered a materially adverse employment action; and (4) he was treated less favorably than similarly-situated employees who did not engage in statutorily protected activity. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 861-62 (7th Cir. 2005) (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002)).

Plaintiffs' prima facie case on the retaliation claim is, like the claims for discrimination, weak if existent at all. There is no evidence before this Court that there were any police officers who engaged in similar misconduct (making false statements about the Chief of Police and sergeants and/or being insubordinate) and had similar performance records. Without such evidence, it is impossible for Plaintiffs to show that the University treated them differently. Plaintiffs "make[] no

attempt to meaningfully compare [their] situation with that of any similarly situated, non-African-American employee or any employee who did not lodge complaints under Title VII." *Beamon*, 411 F.3d at 862. "A similarly-situated employee must have been disciplined, or not, by the same decisionmaker who imposed an adverse employment action on the plaintiff." *Little*, 369 F.3d at 1012 (citation omitted). There is no such evidence in this record.

Another fatal blow to Owoseni and Smith's claim is the fact that the University was not the decisionmaker in this case. As employees of a state university, Owoseni and Smith are subject to the State Universities Civil Service Act, 110 ILCS 70/0.01. Decisions made by the Merit Board are subject to review by the Illinois courts pursuant to the Administrative Review Act, 735 ILCS 5/3-101, *et seq*. It is undisputed that the Merit Board made the decision to discharge Owoseni and Smith, and there is no competent evidence that the Merit Board's decision was in any way wrongfully motivated. The charges on which the Merit Board's decision were based involved acts by Owoseni and Smith which had nothing to do with their complaints of racial discrimination. Moreover, Owoseni and Smith did not seek review of the decision.

Finally, Nichols's claim fails because he was never subjected to a materially adverse employment action. He remains employed with the University. As a matter of law, this Court finds that placing Nichols on administrative leave with pay is not an adverse employment action. *See Singletary v. Missouri Dept. of Corr.*, 423 F.3d 886 (8th Cir. 2005).

D. Pretext

If Plaintiffs could establish a prima facie case of discrimination or retaliation, the University would have to articulate a nondiscriminatory reason for its decisions, and each plaintiff would then have to come forward with "competent evidence that the proffered nondiscriminatory reason was

a pretext" for discrimination or retaliation. *Little*, 369 F.3d at 1012. Although the Court has found that no plaintiff has made a prima facie case of discrimination with respect to assignments, upgrades, or retaliation, the Court will briefly address this part of the *McDonnell Douglas* analysis.

With respect to assignments, one of the University's proffered nondiscriminatory reasons for assigning Plaintiffs to the East St. Louis campus is that the University Police Department management honestly believed that Owoseni, Smith, and Watson wanted to work there. This was based in part on the facts that (1) Smith and Watson had requested assignment to the East St. Louis campus, and (2) Owoseni had requested to work with Sergeant Jacobs, who was primarily assigned to work in East St. Louis. (*See* Affidavit of Tony Bennett, attached to Doc. 46.)

Moreover, the assignments were made pursuant to the CBA which provides, " . . . the assignment of shifts and location shall be done by the University as needs dictate. The shifts will be assigned as equally and impartially as possible, with the understanding that operational needs, as determined by the University, shall prevail." (*See* Exhibit 1 to Affidavit of Richard Harrison, attached to Doc. 46.) Notably, no grievances were filed on the basis that the assignments violated this provision.

There is nothing in the record that proves that "the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination," *Little*, 369 F.3d at 1012, and Plaintiffs have failed to establish that the University's proffered nondiscriminatory reason for assigning them to the East St. Louis campus is pretextual.

Similarly, the University's proffered reason for promoting Officers Royston and Delmore is that the command staff honestly believed that these officers were the most qualified. To demonstrate a material issue of fact as to whether this reason is pretextual, Plaintiffs must show

"either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible." *Hudson*, 375 F.3d at 561. "Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Id.*

Here, none of the plaintiffs in this case has offered any evidence showing that he was more qualified. There is nothing to make it more likely that a discriminatory reason motivated the University, and there is nothing showing that the University's excuse is phony. Again, off-handed speculation by non-decisionmakers is not competent evidence; Plaintiffs have again failed to establish pretext.

Finally, the University claims it recommended the discharge of Owoseni and Smith because, among other things, they made false statements and were grossly insubordinate. As discussed above, the Merit Board held a full hearing on these allegations and agreed with the University. There is no competent evidence that the Merit Board's decision was based on discriminatory animus; Plaintiffs have again failed to establish pretext.

## CONCLUSION

Accordingly, the motion for summary judgment (Doc. 45) is **GRANTED**, and this action is **DISMISSED on the merits**. The Clerk is **DIRECTED** to enter judgment accordingly. Defendant is awarded its costs.

**IT IS SO ORDERED.**

DATED: 05/17/06

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge